# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| BETH A. SCHIEFFER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 11-CV-99-PJC |
| | ) |
| MICHAEL J. ASTRUE, Commissioner of the | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Claimant, Beth A. Schieffer ("Schieffer"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Schieffer's application for disability benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Schieffer appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Schieffer was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

### Claimant's Background

Schieffer was 47 years old at the time of the hearing before the ALJ on June 22, 2009. (R. 24, 26). She testified that she had been in special education classes and had not graduated from high school. (R. 26). She said she had problems reading, but could tell if she had been given correct change if she purchased something at the store. (R. 26-27).

She had worked fairly steadily from 1992 through 2004, at which time her earnings trailed off, and she asserted onset of disability as January 1, 2006. (R. 27). She said that in 2004 her problems from her bipolar disorder had increased. *Id.*

Schieffer testified that she had previously had a problem with methamphetamine addiction, had gone through rehabilitation successfully, and had last used it in 2002. (R. 28). Her husband had previously been abusive, but had gotten help for it, and she said things were "great" at the time of the hearing. (R. 29).

Schieffer testified that in January 2006, her problems with her mood disorder increased to the point that she felt that she couldn't cope. *Id.* She was on a roller coaster with moods, where she would be okay one day and be so depressed the next day that she couldn't get out of bed or do any activities such as housework. *Id.* She said that her energy level was generally low, but she would have infrequent times when she would have high energy and get things done. (R. 29-30). At the time of the hearing, she said that she generally spent her time in bed, approximately 16 hours in a typical day. (R. 30). She would mostly sleep in bed, but sometimes watch "a little TV." *Id.*

Schieffer testified that she couldn't shop because she had panic attacks when she went to the store. *Id.* She went to church once a month. *Id.* Her friends came to see her at her house because she didn't leave her house. *Id.* She said that her husband had the one vehicle that they owned, and she only drove places like the gas station after he came home from work. (R. 31).

Due to inability to concentrate, she didn't read books any more, and she could only watch about five or ten minutes of television or a movie. *Id.* She didn't do many household chores because she couldn't motivate herself to keep the house clean. *Id.* She had been taking Abilify for two-and-a-half years, and it had improved her mood to the point that she didn't consider

suicide any more. (R. 31-32).

A Veterans Administration ("VA") summary indicates that Schieffer was last seen at an Omaha VA medical clinic on August 17, 2004. (R. 183). The summary indicates that Schieffer was diagnosed with depression and bipolar disorder on August 11, 2005, and with bipolar disorder on January 29, 2007. *Id.*

Naveen N. Kumar, M.D., with the VA in Tulsa, saw Schieffer on January 29, 2007 for a mental health initial evaluation. (R. 194-96). Schieffer reported a history of being treated for bipolar disorder at the VA Medical Center in Omaha and said that she was on Depakote, Zoloft, and Trazodone. (R. 195). She said she had problems with depression, anger, irritability, and some mood swings, but she thought she was better than in the past. *Id.* She reported multiple suicide attempts resulting in hospitalization, with the last hospitalization in 2001. *Id.* She reported arrest on various charges due to violence toward others. *Id.* She reported methamphetamine dependence with sobriety since March 2004. *Id.* Dr. Kumar assessed bipolar disorder, type I, most recent episode mixed, but with a question mark. *Id.* He also assessed methamphetamine dependence in sustained remission. *Id.* He adjusted Schieffer's medications. (R. 195-96).

Schieffer saw Dr. Kumar on March 8, 2007, and reported doing better on her medications. (R. 192). Dr. Kumar noted that "[s]he continues to keep up with her job, which has been uneventful since last seen." *Id.* He said that she was "moderately hypomanic but generally appropriate." *Id.* He assessed Schieffer with bipolar disorder most recent episode hypomanic and adjusted her medications. *Id.* Dr. Kumar made a note of a telephone call on March 20, 2007, in which Schieffer complained of sleeping 12-13 hours a day, and he advised her to reduce one of her medications, Geodon. (R. 191).

Schieffer saw Dr. Kumar on May 25, 2007, and he described her as "restless, fidgety, and anxious." *Id.* She had apparently restarted one of her medications, Zoloft, without consulting him. *Id.* He adjusted her medications, including tapering off Zoloft, and increasing Geodon. *Id.*

On July 30, 2007, Schieffer returned to Dr. Kumar accompanied by her husband, and she complained of extreme mood swings, anger, agitation, erratic sleep pattern, and suicidal thoughts. (R. 189). Dr. Kumar described her as anxious, fidgety, and tearful. *Id.* Schieffer reported that she had been hitting herself on her face. *Id.* Dr. Kumar changed Schieffer's medications and apparently referred her for supportive psychotherapy. *Id.*

On August 29, 2007, Schieffer reported that the changes of medications had improved her mood, but she complained of fatigue and memory loss. (R. 187). She reported that she had experienced anxiety and panic attacks, and Dr. Kumar observed her as sad, tearful, and anxious. (R. 187-88). Schieffer reported a "brief part-time job of painting a fence." (R. 187). On December 3, 2007, Dr. Kumar said that Schieffer had a stable mood, but complained of akathisia[1] which was "interfering with her general level of functioning." (R. 178). Dr. Kumar adjusted her medications. *Id.*

On March 5, 2008, Dr. Kumar said that Schieffer reported that her mood was "calmer," and her akathisia had subsided with reducing Abilify. (R. 177). He wrote that Schieffer's "[g]eneral level of functioning is impaired, as is unable to work." *Id.*

On March 26, 2008, an entry was made in the VA records that Schieffer requested that Dr. Kumar call to discuss him writing a disability letter for her. (R. 242). On April 7, 2008, Dr.

---

[1]Akathisia is "a condition of motor restlessness in which there is a feeling of muscular quivering, an urge to move about constantly, and an inability to sit still." Dorland's Illustrated Medical Dictionary 43 (31st ed. 1990).

4

Kumar wrote the following "To Whom It May Concern":

> This is to inform you that [Schieffer] is under my care for chronic recurrent mood disorder ie Bi-polar Disorder. She has had numerous [debilitating] mood episodes requiring hospitalizations and with severe impairment in functioning over the years. [Nevertheless,] she made genuine attempts to work but her condition did not allow her to. She has now reached to a point that she will no longer [] be able to hold on to any gainful employment. She is homebound.
>
> She has been compliant with all recommended treatment.

(R. 176).

At an appointment with Dr. Kumar on June 19, 2008, Schieffer reported that she was maintaining a stable mood. (R. 237). She had been turned down for Social Security. *Id.* Dr. Kumar referred her to CWT/SE.[2] *Id.*

A VA note dated July 1, 2008 states that Schieffer had been contacted to arrange a meeting for a vocational assessment and that she had expressed interest in returning to work. (R. 236). A second note dated July 8, 2008 recounted a visit to Schieffer for the vocational assessment. (R. 235). Schieffer stated that she had reconsidered and had decided not to join the supported employment program. *Id.* She said that she wanted to wait to see if she received Social Security disability benefits. *Id.* She was tearful, and she expressed that her medications for her bipolar disorder helped with her anxiety, but she was tired all of the time. *Id.*

Schieffer saw Dr. Kumar on September 29, 2008, and it was noted that her general level of functioning was "reasonably satisfactory." (R. 233). Dr. Kumar added a medication to address issues of insomnia. *Id.*

Agency consultant Michael D. Morgan, Psy. D., conducted a mental status examination of Schieffer on February 7, 2008. (R. 205-10). Dr. Morgan observed that Schieffer "evinced

---

[2]Compensated Work Therapy/Supported Employment. www.cwt.va.gov.

5

psychomotor retardation and agitation." (R. 205). Dr. Morgan noted that Schieffer's diagnosis of bipolar disorder should be reconsidered because the VA records indicated that she had received that diagnosis while in a state of active methamphetamine dependence. (R. 206). Dr. Morgan reviewed Schieffer's history and current status. (R. 205-07). Dr. Morgan's conclusion based on his observations was that Schieffer had no significant impairment in transferring new information to long-term memory. (R. 207). He found that there were sufficient signs and symptoms present for diagnoses of major depression and panic disorder with agoraphobia. *Id.* Schieffer's responses to questions indicated that her social judgment was good, but her ability to make work decisions and her insight were fair. (R. 208). His diagnostic impressions included a primary diagnosis of chronic post-traumatic stress disorder. *Id.* Other diagnoses were major depressive disorder, recurrent, moderate; panic disorder with agoraphobia; and amphetamine dependence, with physiological dependence, sustained full remission. *Id.* Dr. Morgan scored Schieffer's global assessment of functioning ("GAF")[3] as 46-50. *Id.*

Agency nonexamining consultant Phillip Massad, Ph.D., completed a Psychiatric Review Technique Form and Mental Residual Functional Capacity Assessment dated February 13, 2008. (R. 211-27). For Listing 12.04, Dr. Massad noted Schieffer's depressive syndrome. (R. 214). For Listing 12.06, Dr. Massad noted Schieffer's anxiety as evidenced by recurrent and intrusive

---

[3]The GAF score represents Axis V of a Multiaxial Assessment system. *See* DSM IV at 32-36. A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id*. at 32. The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id*. at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id*. A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id*.

6

recollections of a traumatic experience. (R. 216). He also noted that Schieffer had a history of panic of less severity than the criteria listed on the form. *Id.* For Listing 12.09, he noted Schieffer's history of methamphetamine abuse. (R. 219). For the "Paragraph B Criteria,"[4] Dr. Massad found that Schieffer had moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, with no episodes of decompensation. (R. 221). In the "Consultant's Notes" portion of the form, Dr. Massad summarized Schieffer's educational and work history, her medical history, and her activities of daily living. (R. 223). He noted some of her treatment records from the VA, and he summarized Dr. Morgan's consultative examination. *Id.*

On the Mental Residual Functional Capacity Assessment, Dr. Massad found that Schieffer was moderately limited in her ability to understand, remember, and carry out detailed instructions. (R. 225). He also found that she was moderately limited in her ability to interact appropriately with the general public. *Id.* Dr. Massad gave narrative reasons for his conclusions. (R. 227).

On July 29, 2008, Dr. Kumar completed a Mental Residual Functional Capacity Assessment form. (R. 229-31). He checked boxes on the form indicating that Schieffer had marked limitations in 17 of 20 categories of functioning. (R. 229-30). There were multiple

---

[4]There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") §12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

7

checked boxes in two of the three remaining categories, making it uncertain whether Dr. Kumar meant that Schieffer had no significant limitation, or a moderate limitation, in those categories. *Id.* On the third page asking for narrative comment, he wrote "Please see the attached," but there is no attachment in the administrative transcript. (R. 231).

## Procedural History

Schieffer filed an application dated August 3, 2007, seeking disability insurance benefits under Title II, 42 U.S.C. §§ 401 *et seq*. (R. 90-94). She alleged inability to work beginning January 1, 2006. The application was denied initially and on reconsideration. (R. 47-50, 56-58). A hearing before ALJ Lantz McClain was held June 22, 2009 in Tulsa, Oklahoma. (R. 23-35). By decision dated August 26, 2009, the ALJ found that Schieffer was not disabled at any time through the date of the decision. (R. 7-17). On January 4, 2011, the Appeals Council denied review of the ALJ's findings. (R. 1-3). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. § 404.981.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability

claim. 20 C.F.R. § 404.1520.[5] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

---

[5]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

## Decision of the Administrative Law Judge

The ALJ found that Schieffer met insured status requirements through June 30, 2011. (R. 9). At Step One, the ALJ found that Schieffer had not engaged in any substantial gainful activity since her asserted onset date of January 1, 2006. *Id.* At Step Two, the ALJ found that Schieffer had severe impairments of post traumatic stress disorder, depression, and panic disorder with agoraphobia. *Id.* At Step Three, the ALJ found that Schieffer's impairments did not meet a Listing. (R. 9-10).

The ALJ determined that Schieffer had the RFC to do a full range of work at all exertional levels, with the following nonexertional limitations: "The claimant would be limited to performing simple, repetitive tasks and have only incidental contact with the public." (R. 10). At Step Four, the ALJ found that Schieffer was unable to perform any past relevant work. (R. 16). At Step Five, the ALJ found that there were jobs in significant numbers in the national economy that Schieffer could perform, taking into account her age, education, work experience, and RFC. *Id.* Therefore, the ALJ found that Schieffer was not disabled at any time from January 1, 2006, through the date of his decision. (R. 17).

## Review

Schieffer raises issues regarding the ALJ's consideration of the opinion evidence of Dr. Kumar and regarding the ALJ's RFC determination. The Court finds that the ALJ's decision must be reversed because it did not sufficiently address the opinion evidence of Dr. Kumar, and therefore, the issues Schieffer raises regarding the RFC determination are not addressed.

Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). A treating

physician opinion must be given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques," and it is not inconsistent with other substantial evidence in the record. *Hamlin*, 365 F.3d at 1215. *See also* 20 C.F.R. § 404.1527(d)(2). Even if the opinion of a treating physician is not entitled to controlling weight, it is still entitled to deference and must be weighed using the appropriate factors set out in Section 404.1527. *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004). The ALJ is required to give specific reasons for the weight he assigns to a treating physician opinion, and if he rejects the opinion completely, then he must give specific legitimate reasons for that rejection. *Id.*

The Court finds the ALJ's treatment of Dr. Kumar's opinion evidence to be inadequate because it consists solely of boilerplate[6] provisions:

> The Administrative Law Judge gives little weight to the opinion of Dr. Kumar, the claimant's treating physician, as the doctor apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported (Exhibits 7F and 8F). Yet, as explained elsewhere in this decision, there exist good reasons for questioning the reliability of the claimant's subjective complaints. The course of treatment pursued by the doctor has not been consistent with what one would expect if the claimant were truly disabled, as the doctor has reported.

(R. 15). The Court abbreviates these two boilerplate reasons for discounting Dr. Kumar's opinion evidence as the "relied quite heavily on subjective complaints" provision and the "course

---

[6]A very recent discussion of boilerplate provisions in decisions from the Social Security Administration is found in *Bjornson v. Astrue,* 671 F.3d 640, 644-46 (7th Cir. 2012). In *Bjornson*, the Commissioner's brief described the language that was the focus of the arguments as a "template," meaning a "passage drafted by the Social Security Administration for insertion into any administrative law judge's opinion to which it pertains." *Id*. at 644-45. Judge Posner authored the opinion in *Bjornson* and stated that "[t]he Social Security Administration had better take a close look at the utility and intelligibility of its 'templates.'" *Id*. at 646. The *Bjornson* opinion also favorably quoted the Tenth Circuit case of *Hardman*, discussed in the text, on the troubling nature of boilerplate language.

11

of treatment" provision.

The use of boilerplate language in Social Security disability cases was discussed and discouraged by the Tenth Circuit in *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004). The court explained that boilerplate language was a conclusion in the guise of findings, whereas the task of the ALJ is to explain the specific facts of the case before him and how those facts led him to his decision. *Id.* Boilerplate statements fail to inform the reviewing court "in a meaningful, reviewable way of the specific evidence the ALJ considered." *Id.*

It is easy to identify the two provisions that the ALJ used to discount Dr. Kumar's opinion evidence as boilerplate provisions because they do not give any specific information about Schieffer. In the first provision, the ALJ said that Dr. Kumar "apparently" relied on Schieffer's subjective assertions, and that he "seemed" to accept her reported symptoms uncritically. The ALJ did not give any examples that might have bolstered these vague assertions. Moreover, the Tenth Circuit in an unpublished decision this year labeled this provision as "conclusory" and "improper boilerplate language." *Mayberry v. Astrue*, 2012 WL 375527 at *3, n.1 (10th Cir.) (unpublished). *See also Victory v. Barnhart*, 121 Fed. Appx. 819, 823-24 (10th Cir. 2005) (unpublished) (ALJ's finding that treating physician had relied heavily on the claimant's subjective complaints impermissibly rested on the ALJ's own "speculative, unsupported assumption.").

Another unpublished Tenth Circuit case criticized both boilerplate provisions used by the ALJ here. *Martinez v. Astrue*, 422 Fed. Appx. 719, 726 (10th Cir. 2011) (unpublished). The *Martinez* court recounted the relevant factors set forth in SSR 06-03p that the ALJ is required to consider in deciding what weight to give to treating physician opinion evidence. *Id.* The court said that the evidence cited by the ALJ in giving the provider's opinion little weight revealed that

he did not have the relevant factors in mind. *Id.* In the present case, as in *Martinez*, the ALJ did not discuss relevant factors such as the length of time Dr. Kumar had treated Schieffer and the frequency of their contacts, the consistency of his opinions with other evidence, and Dr. Kumar's qualifications as a specialist. Again, by solely using boilerplate provisions here, the ALJ did not provide any true analysis, and this Court has nothing to review. *See also Langley*, 373 F.3d at 1123 ("Because the ALJ failed to explain or identify what the claimed inconsistencies were between [the treating physician's] opinion and the other substantial evidence in the record, his reasons for rejecting that opinion are not 'sufficiently specific' to enable this court to meaningfully review his findings.").

Had the ALJ given other, legitimate reasons for discounting Dr. Kumar's opinion evidence, his inclusion of improper boilerplate language would not have been fatal. In *Mayberry*, the court said that the provision stating that the doctor apparently relied quite heavily on subjective complaints was conclusory and improper, but the court still affirmed because it found that the ALJ sufficiently explained his decision with two other reasons. *Mayberry*, 2012 WL 375527 at *3. The court in *Mayberry* accepted the "course of treatment" provision as one of the acceptable reasons supporting the ALJ's decision, but it stated that the provision bordered on improper boilerplate language. *Id.* The court construed the provision as relying on inconsistencies between the opinion and the doctor's treatment records. *Id.* In the present case, the Court cannot construe the "course of treatment" provision as anything but an unexplained conclusion. The ALJ did not explain what course of treatment he would have expected from a treating professional who gave the opinions that Dr. Kumar gave. Would the ALJ have expected more frequent contacts? Hospitalization? More medications? None of these questions are answered in the ALJ's decision, and again this Court is left with nothing to review, given the

13

conclusory nature of the provision.

The Commissioner offers many reasons, with specific evidence, why Dr. Kumar's opinions are not sound. But these reasons, and especially the references to specific evidence, were not included in the ALJ's decision or reasoning. The Court will not engage in *post hoc* attempts to save the ALJ's decision by supplying rationales that the ALJ did not supply. *Carpenter*, 537 F.3d at 1267 ("*post hoc* rationale is improper because it usurps the agency's function of weighing and balancing the evidence in the first instance"). The ALJ's decision must be reversed so that the ALJ can properly consider the treating physician opinion evidence of Dr. Kumar.

Because the errors of the ALJ related to the opinion evidence require reversal, the undersigned does not address the remaining contentions of Schieffer. On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Schieffer.

The undersigned emphasizes that "[n]o particular result" is dictated on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

**Conclusion**

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 4th day of May, 2012.

_____
Paul J. Cleary
United States Magistrate Judge